# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIANE NACHBAUR, Derivatively on Behalf of Nominal Defendant BOSTON SCIENTIFIC CORPORATION., | ) ) ) | |
| | ) | Case No. 1:23-cv-10750 |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| MICHAEL F. MAHONEY, NELDA J. CONNORS, CHARLES J. DOCKENDORFF, YOSHIAKI FUJIMORI, DONNA A. JAMES, EDWARD J. LUDWIG, DAVID ROUX, JOHN E. SUNUNU, ELLEN M. ZANE JOSEPH M. FITZGERALD, AND DANIEL J. BRENNAN, SHAWN MCCARTHY, IAN MEREDITH, KEVIN BALLINGER, and SUSAN VISSERS LISA, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Diane Nachbaur ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Boston Scientific Corporation ("Boston Scientific" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers (the "Individual Defendants[1]") to remedy their breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal

---

[1] The Individual Defendants are Michael F. Mahoney, Nelda J. Connors, Charles J. Dockendorff, Yoshiaki Fujimori, Donna A. James, Edward J. Ludwig, David Roux, John E. Sununu, Ellen M. Zane Joseph M. Fitzgerald, And Daniel J. Brennan, Shawn Mccarthy, Ian Meredith, Kevin Ballinger, And Susan Vissers Lisa.

knowledge as to herself and her own acts, and information and belief as to all other matters,

based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which

included, among other things, a review of thousands of pages of nonpublic Company documents

obtained as a result of Plaintiff's books and records demand made pursuant to 8 *Del. C.* § 220,

filings in related actions, the Company's publicly available documents, conference call

transcripts and announcements made by the Individual Defendants and the Company

("collectively, "Defendants"), United States Securities and Exchange Commission ("SEC")

filings, press releases published by and regarding Boston Scientific, legal filings, news reports,

securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Boston Scientific

against the Individual Defendants, certain officers and directors of the Company, for violations of

federal law and breaches of their fiduciary duties.

2.     For the last decade, Boston Scientific sought to develop the Lotus and the Lotus

Edge – a device used to treat aortic stenosis, a deadly chronic and progressive heart disease

impacting over one in eight people over age 75.

3.     Defendants claimed the Lotus Edge was superior to competitor products and that it

offered "a unique ease of use feature" that "gives the physician total control." At all relevant times,

the Lotus and the Lotus Edge was the Company's most important product, within its most

important business segment.

4.     Before its commercial launch in early 2019, the Lotus Edge and its predecessor the

Lotus, faced a series of setbacks. Specifically, the Lotus was ***recalled three times*** to address what

the Company called "technical" issues that developed during the manufacturing process. These

2

recalls were the first of a series of red flags – ignored by the Board and the Individual Defendants – warning that a failure to oversee development of the Lotus and Defendants' related public statements would harm the Company. Indeed, the Board was aware in 2017 and 2018 that █



6.    By the end of 2018, however, Defendants claimed the prior problems with the Lotus had been "fixed," and that the device was capable of capturing 25% of the desired market. Defendants also publicly announced a target of securing 150 Lotus accounts within the first year of its approval by the FDA in April 2019.[7]



[2] ████████████████████████████████████████████████████████████████ *See also* Boston Scientific February 23, 2017, 8-K (noting the 2017 recall of all Lotus devices after the death of a patient triggered the largest single-day decline in Boston Scientific stock since August 2015).

[3] ████████████████████████████████

[4] ████████████████████████████████

[5] ████████████████████████████████

[6] ██████████████████

[7] ████████████████████████████████

7.     From April 24, 2019 through November 16, 2020 (the "Relevant Period"), Defendants claimed that the Company was "on track" to achieve this 150-account target. Defendants also claimed the Company had successfully navigated the pandemic, and that Boston Scientific had in fact met and exceeded its goal to secure 150 U.S. Lotus accounts. Defendant Mahoney, the Company's Chief Executive Officer ("CEO") and Chairman of the Board, further claimed that the Lotus platform was and would "continue to be an important growth driver" for Boston Scientific. Defendant Mahoney also publicly stated the Company was "seeing strong results in the sites that are using Lotus in the U.S. . . . ".

8.     Unbeknownst to investors, the Individual Defendants were aware throughout the Relevant Period that the Lotus required additional product development work and an enhanced delivery system, that the Company was facing clinical scalability challenges related to the Lotus, and that its commercial efforts to expand Lotus' market share were unsustainable and failing. ██████████████████████████████████████████████████████ ████████████████████████████ The Individual Defendants were also aware at all relevant times that the costs to manufacture the Lotus Edge resulted in margins that were unsustainable, and an extraordinary drag on the Company's financials.[8]

9.     Contrary to the Individual Defendants' positive statements, former Boston Scientific sales representatives reported that the Company was missing sales targets by over 50% in 2019 and, after Lotus targets were cut by 25% every quarter, sales continued to come in 25% short of those reduced targets every quarter. The Individual Defendants were aware of these issues.

---

[8] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████

10.     Rather than disclose the truth, Defendants concealed the fact that the Lotus platform was failing and instead continued to misrepresent the product's performance.  For example, in March 2020, Defendant Mahoney told investors that Boston Scientific was "essentially on our planned goals on Lotus of 150 accounts open in the first year."  In reality, Boston Scientific had already taken steps to terminate the Lotus franchise and, in fact, ordered that the Company's Lotus manufacturing facility in Penang, Malaysia be shut down.[9]

11.     Throughout the Relevant Period, the Individual Defendants made or approved false statements and/or failed to disclose that the delivery system for the Lotus Edge was dysfunctional and threatened the continued viability of the entire product line. The Individual Defendants also materially overstated the continued commercial viability and profitability of the Lotus Edge and falsely stated that it would be a growth driver for the Company. Relatedly, the Individual Defendants falsely claimed that the Company was "on track" to achieve this 150-account target.

12.      For instance, on October 15, 2020, Defendant Fitzgerald told investors: "I like what I see in terms of us being now in 150 accounts in the United States."

13.     According to interviews conducted by counsel for lead plaintiff in the related Securities Class Action (defined below), a former Boston Scientific engineer reported that the

---

[9] As recounted by one former manufacturing engineer at the Penang facility that was interviewed by Lead Plaintiff in the Securities Class Action (defined below), there were "zero orders" for the Lotus Edge throughout the second half of 2019 and 2020 and, because the facility was "getting zero orders," the plant was shut down by March 2020.  As this former employee explained, the plant was shutdown because of Lotus—not as the result of the pandemic—and the shutdown occurred before other worldwide manufacturing shutdowns caused by COVID-19.

Company was scrambling to develop a replacement for the Lotus Edge throughout the Relevant Period.  As that engineer explained, Boston Scientific did not have any user studies, task analyses or other records or data of the kind tracked and employed by other medical device companies (like Medtronic) for the Lotus Edge.  This engineer, who previously worked in aviation, explained that ***Boston Scientific's development of the Lotus Edge reflected a disturbing disregard for basic human engineering practices that were similar to those that led to the Boeing 737 Max crashes***.

14.     The truth emerged on November 17, 2020 when, contrary to Defendants' positives statements throughout the Relevant Period, Boston Scientific announced a global recall of all unused inventory of the Lotus Edge, citing "complexities associated with the product delivery system." Defendants announced further that "[g]iven the additional time and investment required to develop and reintroduce an enhanced delivery system, the company has chosen to retire the entire Lotus product platform immediately." Defendant Fitzgerald admitted than rather than surpass the 150-account Lotus target, there were in fact just "sub-100" Lotus accounts in the United States, or a third less than Defendants told investors had been secured just weeks earlier. Defendants further disclosed that actual and estimated Lotus sales for 2019, 2020 and 2021 were almost half analysts' consensus estimates for the product—revealing that the product had performed far worse than investors had appreciated based on Defendants' misrepresentations.

15.     As Defendant Fitzgerald admitted the next day, Boston Scientific never secured the 150 accounts the Company had touted in October—but rather, after it "launched about 100 accounts in the U.S.," the Company determined to shut down the franchise because the business was unsustainable. The same day, Boston Scientific shares declined from a closing price on November 16, 2020 of $38.03 per share, to close at $35.07 per share, a decline of $2.96 per share or approximately 8%, on heavier than usual volume.

16.     As a result of the foregoing, a securities fraud class action was filed against the Company and Individual Defendants Mahoney, Brennan, Fitzgerald, McCarthy, Ballinger, Meredith, and Lisa, captioned *in re Boston Scientific Corporation Securities Litigation*, Case No. 20-cv-12225-DPW (D. Mass.) (the "Securities Class Action").

17.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial harm, including the costs of defending against and potential class-wide liability in the related Securities Class Action, as well as additional damages, including reputational harm and loss of goodwill.

18.     Plaintiff did not make a demand on the Board to bring this action against the Individual Defendants because such a demand is futile.  As detailed further herein, a pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     In connection with the acts, conduct and other wrongs complained of herein,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Boston Scientific is headquartered in this District and conducts business in this District.

## PARTIES

### Plaintiff

24. Plaintiff is, and has been at all relevant times, a shareholder of Boston Scientific common stock.

### Nominal Defendant

25. Nominal Defendant Boston Scientific is a Delaware corporation headquartered in the State of Massachusetts.

### Individual Defendants

26. Defendant Michael F. Mahoney served at all relevant times as the Company's Chairman, President, and Chief Executive Officer.  For the fiscal years ended December 31, 2019, 2020, and 2021, Defendant Mahoney received $15,764,140, $13,773,795, and $16,064,039 in total compensation from the Company, respectively.

27. Nelda J. Connors has served as a member of the Board since December 2009. For the fiscal year ended December 31, 2021, Defendant Connors received $325,418 in total compensation from the Company.

28. Charles J. Dockendorff has served as a member of the Board since April 2015. For the fiscal year ended December 31, 2021, Defendant Dockendorff received $345,000 in total compensation from the Company.

29. Yoshiaki Fujimori has served as a member of the Board since July 2016. For the

fiscal year ended December 31, 2021, Defendant Fujimori received $320,000 in total compensation from the Company.

30.     Donna A. James has served as a member of the Board since July 2015. For the fiscal year ended December 31, 2021, Defendant James received $340,000 in total compensation from the Company.

31.     Edward J. Ludwig has served as a member of the Board since March 2014. For the fiscal year ended December 31, 2021, Defendant Ludwig received $360,000 in total compensation from the Company.

32.     David Roux has served as a member of the Board since January 2014. For the fiscal year ended December 31, 2021, Defendant Roux received $340,000 in total compensation from the Company.

33.     John E. Sununu has served as a member of the Board since April 2009. For the fiscal year ended December 31, 2021, Defendant Sununu received $340,000 in total compensation from the Company.

34.     Ellen M. Zane has served as a member of the Board since April 2016. For the fiscal year ended December 31, 2021, Defendant Zane received $320,000 in total compensation from the Company.

35.     Joseph M. Fitzgerald served as Boston Scientific's executive vice president and president, Rhythm Management beginning February 2014 and became Boston Scientific's executive vice president and president, Interventional Cardiology effective July 6, 2020.

36.     Daniel J. Brennan served at all relevant times as the Company's executive vice president and chief financial officer, a position he has held since January 2014.  Defendant Brennan's began at Boston Scientific in December 1996 and has held various positions at the

Company, including as vice president of finance and information technology for worldwide financial and strategic planning, investors relations, international finance and Cardiovascular.

37.      Defendant Shawn McCarthy served as Boston Scientific's Vice President and General Manager of Structural Heart Valves from July 2017 through January 2020.

38.      Defendant Kevin Ballinger served as the executive vice president and president, Interventional Cardiology, until he resigned on July 3, 2020.

39.      Defendant Ian Meredith currently serves and served as Boston Scientific's executive vice president and global chief medical officer throughout the Class Period.  In this role, he is responsible for leading clinical science and medical affairs across Boston Scientific and providing global leadership of the company's clinical trial strategy.

40.      Defendant Susan Vissers Lisa is vice president of Investors Relations at Boston Scientific and has served in that role since December 2013.

***Non-Parties***

41.      David S. Wichmann has served as a member of the Board since June 2021.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

42.      By reason of their positions as officers and/or directors of Boston Scientific, and because of their ability to control the business and corporate affairs of Boston Scientific, the Individual Defendants owed Boston Scientific and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Boston Scientific in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Boston Scientific and its shareholders.

43.      Each director and officer of the Company owes to Boston Scientific and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Boston Scientific, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Boston Scientific, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or

materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

48.     To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Boston Scientific were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Massachusetts and the United States, and pursuant to Boston Scientific's own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how Boston Scientific conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Boston Scientific and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Boston Scientific's operations would comply with all applicable laws and Boston Scientific's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.     Each of the Individual Defendants further owed to Boston Scientific and the shareholders the duty of loyalty requiring that each favor Boston Scientific's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Boston Scientific and were at all times acting within the course and scope of such agency.

51.     Because of their advisory, executive, managerial, and directorial positions with Boston Scientific, each of the Individual Defendants had access to adverse, non-public information about the Company.

52.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by Boston Scientific.

## BOSTON SCIENTIFIC'S CODE OF CONDUCT

53.     Boston Scientific's Code of Conduct expressly applies to Company directors and

officers, *i.e.*, each of the Individual Defendants.

54.     With respect to Clinical, Regulatory, and Health Care Program Requirements, the

Code of Conduct provides:

> Boston Scientific's products are closely regulated by government agencies, health
> ministries, and other regulatory authorities worldwide. Boston Scientific
> expects you to comply with all clinical, regulatory, and health care program requirements
> in the countries where we do business. The laws and regulations that apply to
> medical device companies continue to evolve. You must be aware of the laws and
> regulations that affect your job.

55.     With respect to Stock Trading Rules, the Code of Conduct provides:

> If you trade in Boston Scientific stock, take care not to engage in "insider trading."
> Insider trading means engaging in transactions in a company's securities (for
> example, buying or selling a company's stock), while aware or in possession of
> "material nonpublic information" about the company or its securities. When
> considering whether information is "material nonpublic information," ask yourself
> questions such as:

> - Has the information been released to the public by the company, or is the
>   information otherwise known generally to the public? If not, it is nonpublic
>   information.
> - Would a reasonable investor consider the information to be important when
>   making an investment decision? If yes, it may be material.
> - Would public disclosure of the information reasonably be expected to affect
>   the price of Boston Scientific securities? If yes, it may be material.

> It is also prohibited to give a "tip" to anyone — including other Boston Scientific
> employees, family, or friends — to enable trading in Boston Scientific stock based
> on material information not available to the public.

> Remember that these rules do not just apply to Boston Scientific's securities and
> information. Insider trading also extends to trading in the stock of our competitors
> and other businesses. Therefore, please take the same insider trading precautions
> with any information you learn about third parties from your job at Boston
> Scientific. You should review the Company's Stock Trading Policy before
> engaging in any transactions in the Company's securities. Please contact Legal with
> any questions.

***

In general, information is material if its public disclosure could reasonably be expected to affect the price of the company's securities or a reasonable investor's decision about buying or selling securities. Material information can include financial results, executive management changes, government investigations, business acquisitions or sales, and product recalls, among other things. Information is non-public if the company has not issued a press release or otherwise provided the information to the public, and it is not otherwise generally known to the public. If you are unsure whether you have material non-public information, you should contact your manager or Legal before trading.

56.    With respect to media, government and attorney engagement, the Code of Conduct

provides:

It is important to understand what to do if you are approached by the media, government, or outside attorneys. Press releases and contact with news media, securities analysts or investment bankers occur only through authorized members of our Corporate Communications, Government Affairs, and Investor Relations Departments. Legal should be part of interactions involving the government or outside attorneys. Here are guidelines we expect you to follow:

- Never comment on, confirm, or deny anything relating to Company business, unless you are expressly authorized by the Company to do so.
- If a member of the news media contacts you, refer this person to Corporate Communications.
- If an analyst, rating agency, or investment banker contacts you, refer this person to the Investor Relations Department.

57.    The section titled "Understand Consequences" in the Code of Conduct states:

Boston Scientific takes violations of this Code, Company policies and procedures, and applicable laws seriously. Where appropriate, the Company takes prompt corrective action, up to and including termination of employment. Corrective action may also occur for other reasons, including if you:

- Direct others to violate a law, regulation, or Company policies and procedures or applicable laws.
- Know of a violation or potential violation, and fail to report it.
- Fail to effectively monitor the actions of people who work for you.
- Fail to cooperate in a Company audit or investigation.
- Provide false, misleading, or incomplete information during a Company audit or investigation.
- Fail to participate in required training.
- Retaliate against someone for reporting an integrity concern in good faith

or for participating in an investigation of such a report.
- Disclose information learned during an internal investigation.

Corrective or disciplinary action depends on the nature, severity, and frequency of the violation. It may vary depending upon local law. Violators of the laws and government regulations mentioned in the Code could expose themselves and the Company to substantial civil damages and criminal penalties, including prison terms.

58.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise their violations of law.

59.     In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## SUBSTANTIVE ALLEGATIONS

60.     Boston Scientific is one the largest manufacturer of medical devices in the world. Starting in 2010, Boston Scientific sought to develop the Lotus and the Lotus Edge. From well before the Relevant Period through its recall, the Lotus Edge was the Company's most important product, in its most important business segment.

### Prior Recalls of the Lotus

61.     Prior to the November 2020 recall, Boston Scientific recalled the Lotus three times and experienced other issues with the Lotus technology.  These red flags, among others, put the Individual Defendants on notice that a failure of the Lotus platform would adversely impact the Company's business results and trigger a significant decline in the Company's stock price.

62.     On September 23, 2014, the Company announced that it initiated a clinical trial in the United States to evaluate the efficacy of the Lotus.  Less than a year later, Boston Scientific

initiated a recall of 278 units in Europe on November 19, 2014 due to the valve becoming "unlocked during release from the delivery system."  According to a notice posted on the FDA's website, when this occurs "it may be necessary to convert the patient to open heart surgery"—the very high-risk procedure the Lotus was designed to avoid.

63.     Several years later, on August 2, 2016, the Company recalled several manufactured lots of the Lotus due to breaks occurring in the mechanism that released the valve from the delivery system.  In total, 250 units were recalled, including investigational devices being used in the U.S.-based REPRISE III clinical trial, which had been fully enrolled and ongoing since the fourth quarter of 2015.  Again, the field safety notice issued by the Company to initiate the recall noted that the component of the delivery system that was breaking was the "release mandrel."

64.     On October 31, 2016, the Company announced a third voluntary recall, this time for its second-generation device the Lotus Edge due to reports that the device could not be fully locked during the procedure.

65.     On February 23, 2017, Boston Scientific disclosed another set-back with Lotus— this time due to reports of a malfunctioning pin involved in the delivery system.  As the Company reported in a Form 8-K filing, Boston Scientific had initiated a voluntary removal of all Lotus devices from global commercial and clinical sites following reports that a pin connecting the valve to the delivery system was releasing prematurely. According to the Company, a patient in Germany died after a doctor tried to implant the device.  This announcement triggered a decline in Boston Scientific stock—with shares falling nearly 10% in response to the news early on February 23, 2017, the largest single-day decline since August 2015.

66.     ██████████████████████████████████████████

████████████████████████████████████████████████

███████  ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

67.     On November 28, 2017, the Company announced a delay in both returning the Lotus platform to the European market and in seeking premarket approval from the FDA. Specifically, the Company told investors that the "company now expects to provide an update on the status of the Lotus Edge Valve during its fourth quarter 2017 earnings conference call on February 1, 2018, as it continues to focus on manufacturing and regulatory milestones."

68.     Despite these issues, Defendants repeatedly assuaged investors' concerns about the future of the device and specifically whether the most recently disclosed delay suggested problems with the device's design.  Defendant Ballinger provided a detailed response, reporting that the issues were related to the "final qualifications and verifications," and were not related to any core valve design, stating that "unfortunately, as that final testing was completed and analyzed, we saw elements of the system performance that frankly didn't meet our expectations and honestly surprised us a bit towards the end."

***Defendants Seek to Relaunch the Lotus***

69.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

70.     ████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

71.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

72.   ████████████████████████████████████████

██████████████████████████████████████████

73.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

74.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

75.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

76.

77.

78.

79.

80.

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

81.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

82.   ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

83.     On February 6, 2019, Boston Scientific announced 2018 fourth quarter and year-end results and an update on the Lotus launch timeline, reporting that the Company expected U.S. approval by early in the second quarter with a limited European release in March.  Addressing the Lotus commercial launch on the call, Defendant Mahoney explained that, "we want to ensure we deliver exceedingly well, to get out of the gate strong, to build up a strong reputation for the product in the U.S." by pursuing a "smartly planned" "controlled launch" focused on "delivering excellent outcomes, building greater confidence with the physician community"—an approach that the Company had already been pursuing, and which had purportedly resulted in "increased utilization rates each quarter."

84. 

85.

***Defendants Make or Approve False Statements Concerning the Lotus Despite Knowledge Contrary to Those Statements***

86.     On April 23, 2019, Boston Scientific issued a press release announcing the FDA's approval of the LOTUS Edge, stating "[t]he LOTUS Edge valve system is the only FDA-approved aortic valve that gives physicians the option to reposition and completely recapture the valve once it has been fully deployed." It further noted that the product "also features a braided valve frame and an adaptive seal that minimizes paravalvular regurgitation for leaking (PVL) by conforming to the patient's native aortic valve." Significantly, the press release also touted the LOTUS Edge's product delivery system, stating, that:

> [b]ringing the much – anticipated LOTUS Edge valve system to market allows us to provide patients who aren't good candidates for traditional surgery a safe and effective treatment alternative to restore proper function to their severely narrowed aortic valve, [which] is a fundamental component of our expanding portfolio and demonstrates our continuing commitment to category leadership within the fastgrowing Structural Heart treatment landscape; [and that Boston Scientific is] thrilled to offer physicians in the U.S. and Europe the clinical benefits of the LOTUS Edge valve system for the treatment of their high-risk patients with severe aortic stenosis, [which] provides physicians a high level of control over the delivery and deployment

of the device and offers surgical-like PVL results to help ensure the best patient outcomes.

87.     On the first quarter 2019 earnings call held the next day, Defendant Mahoney announced the Company would "begin a controlled U.S. launch immediately" and noted that the Company "also began a controlled commercial launch of Lotus Edge in Europe late in the first quarter."  Defendant Mahoney further told analysts "We believe Lotus Edge is a differentiated valve that will be sought after by physicians and operators, both as a workhorse valve as well as a valve that can be counted on to provide superior outcomes in complex cases."

88.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

89.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

90.     Defendants repeatedly assured investors that the Lotus Edge commercial launch had been carefully planned, had been a resounding success, that physicians were rapidly adopting the technology, "re-ordering" the product in droves, and that the Company had been "on track" and "on plan" in meeting the target of establishing Lotus Edge accounts at 150 centers in the United States a year from the date of FDA approval—i.e., by April 2020.  For example, on June 26, 2019, Defendant McCarthy explained the Company's controlled launch strategy was "to launch in roughly 150 accounts within the first 12 months of launch and then soon after we'll start to increase the rate of new customers," and would rapidly expand that 150-account base following the initial

"controlled launch" period.  As Defendant McCarthy told investors on that call, "we've got a great distribution; large, medium, small and whether it's academic or otherwise, it represents the market in our early days of launch, and it's going extremely well."  Defendant Mahoney also highlighted the Company's new facility in Malaysia, which was "ramping up right now with Lotus valve," and noting that the launch had "gained good early momentum."  Defendant McCarthy stated "as mentioned previously, we expect from a Lotus – U.S. Lotus launch to be in roughly at about 150 accounts in the first 12 months..."

91.     Defendants told investors the Company was on track to reach its target of opening accounts in 150 centers in the first 12 months of the launch, and highlighted "very high reorder rates" for the product, "strong reorder" numbers, and said the "reorder rate for existing users is quite high."  For example, on the Company's second quarter earnings call on July 24, 2019, Defendant Mahoney told investors the Company was "really pleased" with Lotus and "we're essentially delivering per our commitment. The 150 accounts that we expect to open, we're on track to deliver that."  Similarly, on September 5, 2019, Defendant Mahoney told investors that the Lotus "results have been very strong," that "We're seeing very high reorder rates of Lotus, and the launch really is going as planned as adjusted in 2019" and "we're seeing strong reorder rates with it."  But far from experiencing "strong" reorder rates of the supposedly 150 accounts that Boston Scientific opened during the Relevant Period, in truth, by mid-2020, the Company had only opened 9-12 accounts.

92.     On July 24, 2019, Boston Scientific issued a press release announcing its results for the second quarter of 2019, stating that the Company "[c]ommenced controlled launch in the U.S. and Europe of the LOTUS Edge Aortic Valve System, a minimally invasive TAVR technology for patients with severe aortic stenosis considered to be at high risk for surgical valve replacement

via open heart surgery."

93.      On the Company's second quarter earnings call on July 24, 2019, Defendant Mahoney told investors the Company was "really pleased" with Lotus and "we're essentially delivering per our commitment. The 150 accounts that we expect to open, we're on track to deliver that." Similarly, on September 5, 2019, Defendant Mahoney told investors that the Lotus "results have been very strong," that "We're seeing very high reorder rates of Lotus, and the launch really is going as planned as adjusted in 2019" and "we're seeing strong reorder rates with it."

94.      As Boston Scientific had previewed, the Company also announced a "full launch" of the product in the fall of 2019—following the initial "controlled launch" immediately after approval—and represented that the "full launch" had accelerated sales.  Specifically, at TCT on September 27, 2019, Defendant Ballinger told investors the Company was "on track to open 150 accounts" and by that time, the "ramp has now accelerated":

> Just on the Lotus launch, so what I would say is the ramp has now accelerated and the mode that we predicted in terms of the – so opening the number of accounts per month that we predicted at full launch. And so we purposely, over the course of the summer, were more in a self-constrained, limited market evaluation mode. And we started loosening that obviously in the July and August timeframe with a stronger ramp and now September.

95.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

96.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████.

97.     On September 27, 2019, Defendant Ballinger told investors the Company was "on track to open 150 accounts" and by that time, the "ramp has now accelerated."

98.     On October 23, 2019, Boston Scientific issued a press release announcing its results for the third quarter of 2019, stating that the Company "[p]resented at TCT [Transcatheter Cardiovascular Therapeutics] positive data for the LOTUS TAVR System, a mechanically-expanding valve, including a three-year analysis from the REPRISE III study demonstrating significant, sustained improvement in functional and health status following LOTUS valve implantation versus CoreValve systems (Medtronic)." The press release also stated the product showed "significantly fewer cases of disabling stroke and moderate or greater paravalvular leak versus the CoreValve system--a self-expanding valve" and that "a Medicare budget impact analysis demonstrated the mechanically-expanded LOTUS valve is a less costly alternative to selfexpanding valves at one year post procedure in high-risk patients with aortic stenosis."  The Company hosted a conference call the same day during which Defendant Mahoney represented that the "Lotus Edge launch is going extremely well and we're building momentum in both the US and Europe. We remain on pace to open 150 accounts in our first 12 months in the US . . . ."

99.     On the Saturday and Sunday of Thanksgiving weekend, 2019, recognizing the launch of the Lotus Edge was in jeopardy, certain of the Individual Defendants convened to discuss dismissal sales results and poor patient outcomes.

100.     ██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

101.    Defendant Lisa told investors at a December 5, 2019 investor conference that the fact that revenue increases for interventional cardiology, and the fact that the Company was reaffirming guidance for its Structural Heart division, showed Lotus had been a material revenue driver:

> And I'd say, we're really pleased with how the Lotus launch is going. And we're not giving specifics in terms of dollars or accounts. And we said we're on track to launch into 150 accounts in the US, one year in, so that'd take us to the end of Q1 of 2020. But I think one point of evidence is we grew mid-teens in interventional cardiology in Q3, which was a clear acceleration. And back to Structural Heart, we're comfortable with the high end of our guidance range.

102.    On February 5, 2020, Boston Scientific issued a press release announcing its results for the fourth quarter and year ended December 31, 2019, stating that the Company "[r]eceived Japanese Pharmaceuticals and Medical Devices Agency (PMDA) approval and positive reimbursement in Japan for the LOTUS Edge™ Aortic Valve System, a minimally invasive [TAVR] technology for patients with severe aortic stenosis."

103.    On February 25, 2020, Boston Scientific filed its 2019 10-K with the SEC, which was signed by Defendants Mahoney and Brennan. The 2019 10-K reported net sales from the Company's Interventional Cardiology subsegment, which includes the LOTUS Edge, stating in part, that "net sales of Interventional Cardiology products of $2.816 billion represented 26 percent of [the Company's] consolidated net sales in 2019," which "increased $226 million, or 8.7 percent, in 2019, as compared to 2018," and that "[t]his year-over-year increase was primarily related to growth in [the Company's] structural heart therapies including [*inter alia*]… [its] TAVR products including [its]… LOTUS™ Edge Valve." In discussing the LOTUS Edge Aortic Valve System

market, the 2019 10-K stated that,

> [s]tructural heart therapies are one of the fastest growing areas of the medical technology market and are highly synergistic with [the Company's] Interventional Cardiology . . . business[]," including the "LOTUS Edge™ Aortic Valve System, which is based on mechanical-expanding architecture"; and that "the LOTUS Edge™ Valve with mechanical-expanding architecture . . . is well suited for intra-annular cases and was launched commercially in the U.S. and Europe in the first half of 2019.

104.    Appended as exhibits to the 2019 10-K were signed certifications wherein Defendants Mahoney and Brennan certified that "the [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the" Exchange Act, and that "the information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of Boston Scientific."

105.    

106.    Despite the critical importance of the Lotus Edge to Boston Scientific, and the red flags warning of actual and potential wrongdoing related thereto, the Board did not have any adequate system in place to oversee the development and sale of the Lotus Edge or ensure the accuracy of Defendants' public statements regarding sales and sales projections for the Lotus Edge. It also failed to charge any committee with said oversight until the formation of the Risk Committee in May 2020 – more than a year into the Relevant Period. What's more, despite the

formation of the Risk Committee, Defendants continued to make or approve false statements related to the Lotus Edge.

107.  ████████████████████████████████████████████████

████████████████████████████████████████████████

108.  On July 29, 2020, Boston Scientific issued a press release announcing its results for the second quarter of 2020, touting that the Company "[p]resented positive findings from the largest reported clinical experience to date with the LOTUS Edge™ Aortic Valve System at TVT [Transcatheter Valve Therapy] Connect," and that "[d]ata from a pre-specified interim analysis of the first 50 patients enrolled in the European RESPOND EDGE post-market registry demonstrated" numerous purported benefits, including "no reports of mortality, no repeat procedures for valve-related dysfunction or re-hospitalization for valve-related symptoms and excellent valve hemodynamics, the lowest PVL rates in this valve category and a reduced permanent pacemaker implantation rate in line with competitive valves in real-world experience." During a conference call that day, Defendant Mahoney stated that:

> LOTUS Edge continues to see strong utilization within existing accounts while new account openings and geographic expansion did slow in the second quarter due to COVID impacts and physician training. June and July results with LOTUS Edge are encouraging, . . . we expect to get back to our regular cadence of account openings in the U.S. and continue our launch in Japan in the second half of '20.
>
> [s]o we are starting to see the gates open up a bit more in terms of new account openings with LOTUS…

109.  On September 16, 2020, Defendants Mahoney and Brennan participated in Morgan Stanley's virtual Global Healthcare Conference with industry analysts and investors, during which Defendant Mahoney stated, in response to an analyst's question, that:

> certainly LOTUS will continue to be an important product for us. It's a significant market, as you know, and even small share gains are significant

for us. And so LOTUS will continue to be an important growth driver for us, supported by our whole platform with ACURATE neo 2…

***

So overall, LOTUS remains a key growth driver for us. And we're not going to give you share estimates, but we're continuing to invest along those lines. We're starting to do more account openings. The reorder rate for existing users is quite high, and we're slowly being able to penetrate some new accounts with some new training. So LOTUS is important for us, but we have other tailwinds to support the company.

110.



111.   On an October 15, 2020 conference call with analysts and investors, Defendant Fitzgerald, stated:

> And then, of course, in our Structural Heart Valves Group, continuing our LOTUS Edge launch in the U.S. and Japan and getting neo2 launched and through our LMR in Europe. So I'm really, really excited about our ability to do this, despite the challenges with COVID around the globe… Now turning to LOTUS Edge, I'm proud to report that we have opened more than 150 accounts in the United States. We are just starting to wrap up our limited market release in Japan with the LOTUS Edge...".
>
> ***
>
> ***I like what I see in terms of us being now in 150 accounts in the United States.*** I think our launch is – I know our launch is gaining momentum….[t]his is now a ground game where we are expanding our footprint in the U.S. each month, we're growing actual procedures per center, per month.

(Emphasis added).

112.   Further, a presentation provided in connection with meeting stated that, for the

Lotus Edge, there was "continued account expansion with over 250 accounts opened globally"—conveying to investors that there was an additional 100 accounts outside of the United States at the time of Defendants' statements.

113.    On October 28, 2020, Boston Scientific issued its financial results for the quarter ended September 30, 2020. During a conference call with investors and analysts in which Defendants Mahoney and Brennan participated, Defendant Mahoney stated that "we're seeing strong results in the sites that are using LOTUS in the U.S." and that "Lotus Edge offers predictable control with a platform that may be fully recaptured and repositioned at any time. We believe both valves offer distinct benefits."

114.    ████████████████████████████████████████████████████████
████████████████████████████████████████

*Investors Are Harmed When Defendants Reveal the Sudden Recall of the Lotus*

115.    On November 17, 2020, the truth was finally revealed when, pre-market, Boston Scientific issued a press release announcing a global recall of all unused inventory of the LOTUS Edge Aortic Valve System, citing "complexities associated with the product delivery system." Specifically, that press release disclosed, in relevant part:

> Boston Scientific . . . has announced it has initiated a global, voluntary recall of all unused inventory of the LOTUS Edge™ Aortic Valve System due to complexities associated with the product delivery system. The voluntary recall is related solely to the delivery system, as the valve continues to achieve positive and clinically effective performance post-implant. [. . . .]

> Given the additional time and investment required to develop and reintroduce an enhanced delivery system, the company has chosen to retire the entire LOTUS product platform immediately. All related commercial, clinical, research & development and manufacturing activities will also cease.

> While we have been pleased with the benefits the LOTUS Edge valve has provided to patients, we have been increasingly challenged by the

intricacies of the delivery system required to allow physicians to fully reposition and recapture the valve," said Mahoney, chairman and chief executive officer, Boston Scientific. "The complexity of the delivery system, manufacturing challenges, the continued need for further technical enhancements, and current market adoption rates led us to the difficult decision to stop investing in the Lotus Edge platform . . . .

This decision is expected to result in estimated total pre-tax GAAP charges of approximately $225 million to $300 million due to inventory, fixed asset, intangible asset and certain other exit charges and approximately $100 million to $150 million of these charges will impact the company's adjusted results. The vast majority of these charges will be recorded during the fourth quarter of 2020.

116.    On this news, Boston Scientific's stock price fell $3.00 per share, or 7.89%, to close at $35.03 per share on November 17, 2020.

117.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

118.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████.

119.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

120.   ████████████████████████████████████████████

██████████████████████████████

121.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

122.    Defendants knowledge of the recall well in advance of its announcement is supported by the fact that the size and scope of the Lotus business shut-down was a substantial undertaking that required months of advance planning and high-level approvals.  For example, in connection with the Lotus Edge recall, the Company shut down its Penang facility in March 2020—and laid off 232 workers in its Maple Grove, Minnesota and Menlo Park, California facilities and 30 workers in Galway, Ireland—actions that required forethought and extensive planning.  The Company was also required by FDA regulations to develop a device recall plan—including, among other things, developing the recall strategy, recall communications, and press release—all of which had to be prepared by Boston Scientific's medical and regulatory personnel and then reviewed by the FDA prior to the initiation of the recall.  See 21 C.F.R. § 7.46.  And prior to announcing the recall, the Company's financial, accounting and investor relations personnel had to calculate the impact on the Company's business and financial results and prepare the disclosures concerning the business shut-down.  These extensive, senior-level actions and decisions further support that Defendants knew the truth about Lotus's poor performance during the Relevant Period.

123.    According to the Memorandum and Order denying in part defendants' motion to dismiss in the Securities Class Action, "Mr. Fitzgerald's November 18, 2020 explanation of the termination of the Lotus platform reasonably construed indicates that the decision was made in fall 2020." ECF No. 74 at 73.

124.    Each of the statements detailed herein and the Amended Complaint in the Securities Class Action were materially false and/or misleading because (i) the Lotus Edge required additional product development work, an enhanced delivery system, reduced training and case support; (ii) the Company was facing increases in both manufacturing complexity and the investment required for clinical scalability; and (iii) as a result of material manufacturing and product delivery difficulties, the Company's commercial efforts to expand Lotus Edge market share and grow, or scale, product sales and accounts were unsustainable.

125.    While Defendants touted the success of the launch of the Lotus Edge, claimed that the Company had opened over 150 accounts in the United States, and that re-order rates for Lotus Edge were "strong," "very high," and increasing, in reality, Boston Scientific never fixed the problems with the device and did not come close to reaching the Company's publicly announced 150-account target. As Defendants would later admit, Boston Scientific never opened 150 accounts, the true number of accounts was actually one-third less than Defendants had represented. In fact, Defendants concluded by no later than the first quarter of 2020 that the Lotus franchise was unsalvageable.

126.    Another "red flag" known or disregarded by Defendants were the departures of key executives responsible for the Lotus Edge at the end of 2019. For example, Defendant McCarthy, the General Manager of Structural Heart Valves, who had served as the leader of the Lotus franchise and the product's spokesperson at the Company's biannual investor day just months

before, resigned to take on another role at a different company. Similarly, the head of Lotus sales and Structural Heart in Europe for the past five years—Sandrine Maset—was transitioned over to a new department (Urology and Pelvic Health) in May 2019, just one month after Lotus was approved in the United States. One of the primary Lotus Edge sales leaders in the United States, Area Vice Presidents for Structural Heart, Richard Maher—who had formally worked in TAVR sales at Edwards and recruited a number of sales representatives from Edwards to Boston Scientific to develop the Lotus sales team—left the Company in February 2020. And Defendant Ballinger, the executive vice president and global president, Interventional Cardiology who announced the FDA's approval of Lotus Edge, took a job at a venture capital firm in June 2020.

127.   Despite the critical importance of the Lotus Edge to Boston Scientific, the Board did not have an adequate system in place to oversee the development and sales of the Lotus Edge or ensure the accuracy of Defendants' public statements regarding the development and sales of the Lotus Edge. Indeed, it failed to charge any committee with said oversight until the formation of the Risk Committee in May 2020 – more than a year into the Relevant Period. But despite forming the Risk Committee, Defendants continued to make or approve false statements related to the Lotus Edge.

128.   Numerous former Boston Scientific employees interviewed by Lead Plaintiff in the Securities Class Action corroborate the allegations herein:

   a.   As FE 1, a 20-year veteran at Boston Scientific who worked as a Principal Therapy Consultant in the Structural Heart division from 2000 to January of 2021 in the New York/New Jersey area, recounted "in 2018 we all go into the training [for the Lotus] and were all surprised. The VP of marketing is saying we're expected to go out and get 25% market share. I've been in the business for a long time and so I said to him, 'You've got to be out of your mind.'" According to FE 1, Boston Scientific senior management was, at best, "willfully blind to the reality" of the market potential for Lotus. In truth, "Maybe there were three or four doctors [across the country] that said they'll use the Lotus every day. So, they listened to those three and not the other 300 that said they'll

use it a handful of times a year." FE 1 confirmed that the 5-10% market share was consistent across the U.S. sales staff surveys: "We were all getting the same numbers from our people" demonstrating that the potential TAVR market was between 5-10% of cases. FE 1 was tasked with carrying out that survey for the centers FE 1 covered and, according to the feedback FE 1 received, the Lotus Edge would be applicable in 5-6% of patients. Moreover, based on conversations with Boston Scientific Structural Heart colleagues around the country, the consensus from TAVR centers was that the Lotus Edge could achieve at most a 5-10% market share.

b. FE 2, a Principal Clinical Field Manager in Boston Scientific's Structural Heart division from January 2017 through January 2021, stated the relatively high pacing rate for the Lotus was a substantial barrier to sales—as the higher pacemaker incidence clearly increased the risk for patient outcomes (including the risks involved in introducing another device into the procedure, the increased risks of infection, and longer recovery times and hospital stays). Moreover, according to FE 2, even the centers that used the Lotus Edge were getting higher pacemaker rates than reported in the literature. FE 2 noted that "a lot" of Boston Scientific sales representatives "still had centers that were still getting pace rates in the high teens to 20% range, which is higher than our competitors that were in single digits or low teens."

c. FE 3, a Therapy Consultant at Boston Scientific in the Structural Heart Division, in San Diego responsible for the launch of the Lotus Edge, market development, and customer education and training, described several flaws of the Lotus Edge's delivery system that were not remedied prior the Lotus commercial launch, contributed to the poor adoption by surgeons, and led the Company to pull the product. FE 3 explained that this malfunction—termed internally by Boston Scientific personnel as "Twisted Post"—occurred when the three push-pull rods utilized in the Lotus delivery system prevented the Lotus valve from locking into position properly because it would be impeded by friction due to heavy calcium or other issues in the patient's anatomical valve. FE 3 explained, "The complexity is there are too many moving parts."

d. FE 4, an Interventional Cardiology Territory Manager at Boston Scientific responsible for Lotus sales from January 2016 to January 2021, reported that while Boston Scientific sales force training guides claimed Twisted Post was a "rare event," in fact, the opposite was true. In reality, it was "not a rare event, it happened 50% of all cases."

e. FE 6, a Principal Human Factors Engineer at Boston Scientific from February 2019 to April 2020, was hired to work on developing a new deployment system for a next generation TAVR valve that was intended to replace the Lotus Edge, and said that Boston Scientific misrepresented the issues with Lotus. FE 6 explained that the Company's idea was to release the Lotus Edge, after FDA approval, but release a next generation TAVR system to replace it as soon as possible. As FE 6 recounted, this was because Boston Scientific senior

management knew that the Lotus Edge was hard for physicians to use—an issue that was known and "went all the way up" to the senior-most levels of the Company—but the Company needed to have a TAVR valve in order to "keep their share" of the market.

f.   According to FE 7, who reviewed internal non-public Lotus Edge revenues and worked closely with the financial team that forecasted product revenues, Lotus Edge "came in at less than half of what they expected for 2019."

g.   FE 9, a Manufacturing Engineer at Boston Scientific's facility in Penang, Malaysia from early 2018 until March 2020, recounted that there were "zero orders" for the Lotus Edge through the end of 2019 and first quarter of 2020. FE 9 confirmed that the fact that there were "zero orders" for Lotus, and that no manufacturing work was being performed on the device in Penang, was something that occurred before the major worldwide slowdowns resulting from COVID-19.

129.   As the manufacturer of the Lotus Edge, Boston Scientific was required by federal law to monitor, investigate and report adverse events to the FDA,[10] and Defendants in fact closely tracked the adverse events associated with the Lotus Edge.

130.   Defendants Mahoney, Meredith, McCarthy, and Ballinger discussed the performance of the Lotus Edge with internal Lotus Edge sales staff on monthly sales meetings during which the sales force would raise challenges they were experiencing in the field.

131.   After Defendants secretly determined to shutdown the Lotus franchise and recall the Lotus Edge, Defendant Mahoney entered a unique Rule 10b5-1 trading plan so that he could sell $9 million worth of stock before the truth was revealed. Specifically, on August 25, 2020, just one week after Boston Scientific falsely reported (among other things) that the Company had

---

[10] Boston Scientific regularly submitted to the FDA adverse event reports concerning the Lotus Edge that revealed problems with the device were causing an alarming incidence of deaths, serious injuries, and complications from the device's delivery system malfunctioning.  Under FDA regulations, "device user facilities"—essentially, hospitals and other health care centers—are required to report to both the FDA and the manufacturer whenever a device is believed to have caused or contributed to a patient's death.  21 C.F.R. § 803.30(a)(1). User facilities are also required to report to the manufacturer when a serious injury occurs that may reasonably be attributed to a device. 21 C.F.R. § 803.30(a)(2). Further, Boston Scientific was specifically required to monitor and track adverse events associated with the Lotus Edge in connection with its approval by the FDA.  The adverse event reports that are sent to the FDA are compiled in the agency's Manufacturer and User Facility Device Experience ("MAUDE") database, which is used to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of these products.  See 21 C.F.R. Pt. 803.

opened 138 accounts, Defendant Mahoney entered into a Rule 10b5-1 trading plan covering the sale of up to 259,207 shares of Boston Scientific stock worth approximately $10 million at the date of adoption.  The plan was designed to expire 50 business days from adoption—the shortest-lived Rule 10b5-1 plan ever adopted by Defendant Mahoney or any Boston Scientific executive. Moreover, the shares executed under the plan were sold all at once, a first for Defendant Mahoney. The sales under every prior plan adopted by Defendant Mahoney had been sold over the course of three or more months. Additionally, the time between adoption and when trades were executed was less than 60 days, another indicia of fraud. Finally, the timing of the sales under the plan appears non-random in light of the fact that they were executed three days prior to the scheduled expiry of the plan and exactly 14 days prior to the announcement of the Lotus shut-down. The unique and highly unusual characteristics of this 10b5-1 trading plan enabled Defendant Mahoney to sell over $9 million worth of his personally held stock exactly two weeks before Boston Scientific disclosed the Lotus shut-down, and is highly probative of fraudulent intent.

***The Securities Class Action***

132.    In December 2020, two class action lawsuits, including the Securities Class Action, were filed against Boston Scientific and certain Company executives for violations of the Securities Exchange Act, in connection with their conduct described herein.

133.    On December 20, 2022, the Court in the Securities Class Action denied defendants' motion to dismiss in part, holding plaintiff stated a claim for relief under the heightened pleading standard applicable to the motion. *See* Securities Class Action, ECF No. 74. Specifically, according to the Memorandum and Order, the complaint adequately states claims with respect to "[t]wo sets of statements", namely: "1) The inaccurate tallies of the number of accounts opened in the Lotus launch by Ms. Lisa and Mr. Fitzgerald on August 19 and October 15, 2020, respectively;

and 2) Mr. Mahoney's September and October statements that the Lotus platform was a key growth

driver and a viable investment." Securities Class Action, ECF No. 74 at 59.

134.    With respect to the first category of actionable statements, the court found:

Plaintiff pleads adequately that Ms. Lisa and Mr. Fitzgerald misstated the number
of Lotus accounts opened in the United States as of August 19, 2020 (138 accounts)
and October 15, 2020 (over 150 accounts) and that the misstatements were material.
As alleged, the day after Boston Scientific announced its decision to terminate the
Lotus platform, Mr. Fitzgerald announced that Lotus Edge had only launched
"about 100 accounts in the U.S. Making all reasonable inferences in Plaintiff's
favor, I find Mr. Fitzgerald's November report of 100 accounts, accompanied by
Boston Scientific's decision to terminate the Lotus platform, support the conclusion
that Ms. Lisa and Mr. Fitzgerald presented inaccurate tallies of Lotus Edge
accounts.

Account reports by Ms. Lisa and Mr. Fitzgerald's are also material.  Ms. Lisa and
Ms. Fitzgerald both represented that the Lotus Edge launch was hitting concrete
milestones when, according to the allegations in the Complaint, it was not.

*Id*. at 42 (internal citations omitted).

135.    With respect to the second category of actionable statements, the court found:

Mr. Mahoney's statements are adequately alleged to have been materially
misleading when viewed in the light most favorable to Plaintiff.  According to Mr.
Fitzgerald's November 18 account of the decision to retire the Lotus platform,
discussed above, Defendants were in the process of critically evaluating the Lotus
platform in the fall of 2020.  When Mr. Mahoney made these representations that
Lotus was driving growth and a dual-valve strategy made sense for the company,
Boston Scientific's leadership had either already decided the Lotus platform was
unsalvageable or was on the cusp of doing so in a matter of weeks.  Under these
circumstances, the representations that the Lotus platform was still driving growth
and its continuation made sense from an investment standpoint are adequately
alleged to constitute specific misrepresentations that the Lotus Edge was and would
remain viable.

*Id*. at 57-58 (internal citations omitted).

136.    With respect to scienter as to Defendant Mahoney, the court found, among other

things that:

Mr. Mahoney, the CEO of Boston Scientific, on two occasions in fall 2020 —
shortly before directing discontinuance of the Lotus platform — made specific
statements touting Lotus and the two-valve strategy. Mr. Fitzgerald's November

18, 2020 explanation of the termination of the Lotus platform reasonably construed indicates that the decision was made in fall 2020…. Mr. Mahoney announced the decision to discontinue Lotus, stating that the decision was made "[a]fter much analysis and careful consideration." It is not unreasonable to infer that Mr. Mahoney was privy to, or at least aware of, discussions surrounding Lotus during this time period, given his September and October statements plugging the product and his position as CEO of Boston Scientific.

***

"[T]he relevant point here is not that [Lotus] was the only or the most 'outsized' [Boston Scientific] product." The point is that when a chief executive, like Mr. Mahoney, makes specific remarks on the role of a product in a company's portfolio, there is a "very strong inference" that such an executive "would have paid at least some attention to the product's status." I find that, on the facts as pleaded in the Complaint, the inference applies. In summary, Plaintiff has pleaded scienter as to Mr. Mahoney.

*Id*. at 73-74 (internal citations omitted).

## HARM TO THE COMPANY

137.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred substantial financial losses, including but not limited to the costs of defending and potentially incurring class wide liability in the Securities Class Action, the costs of defending government investigations, as well as additional losses, including reputational harm and loss of goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

139.    Boston Scientific is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

140.    Plaintiff is a current shareholder of Boston Scientific and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged

herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

A pre-suit demand on the Board of Boston Scientific is futile and, therefore, excused.  During the illegal and wrongful course of conduct at the Company and to the present, the ten-person Board consisted of Individual Defendants Mahoney, Connors, Dockendorff, Fujimori, James, Ludwig, Roux, Sununu, Zane (the "Director Defendants") and non-party David S. Wichmann.

141.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.  As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that all of the current directors of Boston Scientific, and in particular the nine Director Defendants, are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

142.    The Director Defendants either knew or should have known of the false and materially misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

143.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

144.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders,

authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

145.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members, the Director Defendants knew, or should have known, the material facts surrounding the development and manufacturing challenges related to the Lotus.

146.    The Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

147.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Boston Scientific's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

148.    Furthermore, demand, in this case, is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each

other. The Director Defendants have longstanding business and personal relationships with each other and with other Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders

149.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

150.     Individual Defendant Mahoney is not disinterested or independent.  Defendant Mahoney is CEO of the Company, and he derives substantial compensation from his relationship with the Company.  Thus, Defendant Mahoney is not disinterested or independent.  Moreover, Defendant Mahoney was directly involved in and perpetrated the scheme described above. Furthermore, Defendant Mahoney has been named as a defendant in the Securities Class Action.

151.     The Director Defendants who serve on the Audit Committee are not disinterested or independent.  The purpose of the Audit Committee is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements.  Therefore, the Defendants knowingly or recklessly allowed the aforementioned improper statements.

152.     Significantly, the Director Defendants have taken no remedial action to redress the conduct alleged herein. Non-party David Wichmann has likewise taken no action to correct this misconduct.

153.     Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

**Against the Individual Defendants for Violations of § 10(b)
of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

154.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

155.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

158.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Boston Scientific were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

159.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Boston Scientific, their control over, and/or receipt and/or modification of Boston Scientific's allegedly materially misleading statements, and/or their associations with the

Company which made them privy to confidential proprietary information concerning Boston Scientific, participated in the fraudulent scheme alleged herein.

160.   As a result of the foregoing, the market price of Boston Scientific common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Boston Scientific common stock in purchasing Boston Scientific common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

161.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

162.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

164.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

165.   The Individual Defendants engaged in a sustained and systematic failure to properly

exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166.    Defendant Mahoney also breached his fiduciary duties by selling Boston Scientific stock at artificially inflated prices while in possession of material, non-public Company information.

167.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

168.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

<u>COUNT III</u>

**Against the Individual Defendants for Unjust Enrichment**

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Boston Scientific.

171.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Boston Scientific that was tied to the performance or artificially inflated valuation of Boston Scientific, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

172.    Plaintiff, as a shareholder and a representative of Boston Scientific, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.    Plaintiff on behalf of Boston Scientific has no adequate remedy at law.

### COUNT IV

**Against the Individual Defendants for Waste of Corporate Assets**

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

176.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring billions of dollars of legal liability and/or legal costs, including the judgment in the Securities Class Action.

177.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

178.    Plaintiff on behalf Boston Scientific has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 6, 2023

**MATORIN LAW OFFICE, LLC**

By:  /s/ *Mitchell J. Matorin*

**OF COUNSEL:**

Mitchell J. Matorin (BBO# 649304)
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100
mmatorin@matorinlaw.com

**RIGRODSKY LAW, P.A.**

Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

*Attorneys for Plaintiff*

**LONGMAN LAW, P.C.**

Howard T. Longman
354 Eisenhower Parkway, Suite 1800
Livingston, N.J. 07039
(973) 994-2315
Hlongman@longman.law